# EXHIBIT A

508/ O
/ CO5



**MARK S. GURALNICK**
*A Professional Corporation*
By: Mark S. Guralnick, Esq.
800 Cooper Road, Suite 3
Voorhees, NJ 08043
(856) 983-9900
Fax: 1-800-613-2585
Email: msg@guralnicklegal.com
*Attorneys for the Plaintiffs*

---

**MARK S. GURALNICK**
and **SUZANNE GURALNICK,**
and all other persons similarly
situated (on behalf of a class)

    *Plaintiffs*

    v.

**WELLS FARGO & COMPANY,**
trading as Wells Fargo Mortgage
and/or Wachovia Mortgage,
**WELLS FARGO MORTGAGE,**
trading as Wachovia Mortgage,
**WACHOVIA MORTGAGE,**
trading as Wells Fargo Mortgage,
**WACHOVIA CORPORATION,**
trading as Wachovia Bank,
**XAVIER PEREZ,**
and
**ABC CORPORATION,**
**XYZ CORPORATION,**
**JOHN DOES 1 through 50,** and
**JANE DOES 1 through 50,**

    *Defendants*

---

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION
CAMDEN COUNTY

Docket No.  L 811-13

CIVIL ACTION

**CLASS ACTION**

**CLASS ACTION COMPLAINT,
DEMAND FOR TRIAL BY JURY,
CERTIFICATION PURSUANT TO R. 4:5-1,
DESIGNATION OF TRIAL COUNSEL,
AND NOTICE IN LIEU OF SUBPOENA**

      Plaintiffs MARK S. GURALNICK and SUZANNE GURALNICK, each individually and

on behalf of a class of similarly situated persons, hereby file this civil action, to be certified and

maintained as a class action suit pursuant to R. 4:32-1, *et. seq.,* against the Defendants captioned

above, and say:

**INTRODUCTION**

1. This class action is by Plaintiffs, Mark S. Guralnick and Suzanne Guralnick ("Plaintiffs") for damages and declaratory relief, both individually and on behalf of a class of residential mortgagors doing business with Wells Fargo Mortgage and Wachovia Mortgage throughout the State of New Jersey. Plaintiffs and the other members of the Class have borrowed money from the Defendants and/or their affiliates, have executed mortgage loan notes and granted mortgages on their homes to the Defendants, and have paid and attempted to continue paying their mortgage loans to the Defendants and/or their servicing agents.

2. Plaintiffs and other members of the Class have filed petitions for bankruptcy and subsequently have withdrawn their petitions and/or their bankruptcy actions were dismissed. The Defendants, in such case,  have refused to reinstate mortgages, have refused to de-classify mortgagors from the Wells Fargo bankruptcy department so that they could make timely payments and restore their credit, have refused to accept, process and post payments made or tendered to them, have refused to accept lump sum payments or workout payments, and have openly, boldly and defiantly refused to communicate with Plaintiffs and other such mortgagors following the removal of the bankruptcy stigma.

3. Moreover, Defendants have established systematic artificial, inappropriate, unlawful and unduly burdensome barriers to making payment which have prevented Plaintiffs from paying their mortgage loans; have interposed a scheme of retaining Plaintiffs in "bankruptcy status" indefinitely, while late charges and other surcharges accrue, and have otherwise conspired to prevent Plaintiffs and other members of the Class from paying their mortgage loans on a timely basis, with the ultimate objective of imposing late fees prematurely and without basis, or to impose such fees and other surcharges based on the untimeliness of payments that were, in fact, previously attempted to be made and rejected by the Defendants.

4. In addition, Defendants have so negligently and recklessly managed their customer service system as to refuse to read correspondence sent to them by Plaintiffs after Plaintiffs were

requested to send such correspondence. As a result thereof, Defendants have unlawfully assessed charges for hazard insurance on residential properties that were already insured, and for which no additional hazard insurance was required, despite clear proofs and communications from mortgagors that such improper hazard insurance assessments were unwarranted because of the pre-existence pf insurance coverage. Defendants have openly perpetuated this scheme of charging for unnecessary hazard insurance, while openly and recklessly running their mis-managed customer service system – all in a scheme to frustrate, sidetrack, delay, and confuse mortgagors, and to assess and collect unlawful insurance assessments on mortgage loans.

5. In furtherance of these schemes, practices, patterns and concerted actions to block reinstatement of mortgage loans, refuse payments from customers, decline reinstatement once bankruptcy actions are dismissed or withdrawn, and to assess unlawful charges for unnecessary hazard insurance, (a) Defendants have refused to provide written statements to Plaintiffs; (b) have refused to provide payment or payoff information to Plaintiffs; (c) have openly and continuously promised to return phone calls to Plaintiffs and then failed to do so; and (d) have maintained a scam system of customer service call escalation procedures, designed to relegate mortgagors believed to be in "bankruptcy status" to a series of unrelated customer service workers, imposters, purported "supervisors" and other personnel whose single purpose is to delay and hinder the resolution of the customer's inquiry in order to protract the unlawful practice of imposing late charges, surcharges and other fees, and charging for hazard insurance unnecessarily.

6. Defendants' actions violate the New Jersey Consumer Fraud Act. and other laws of the State of New Jersey, as more fully outlined below

7. By this class action, Plaintiffs are seeking to compel Defendants to (a) remove them from "bankruptcy status" and to transfer their account to a proper division or department that oversees ordinary mortgage accounts; (b) reinstate their mortgage loan to the extent necessary to permit Plaintiffs to pay their delinquency; (c) accept payments in satisfaction of the outstanding

current balance due; (d) reverse all hazard insurance charges unnecessarily imposed; (e) to modify and adopt customer service procedures appropriate to the express and implied account handling procedures that are incorporated into the servicing of a mortgage loan; (f) to reverse all late charges, additionally accrued interest, assessments and additional levies, and to otherwise restore Plaintiffs to the credit position and level of indebtedness they would have held had Defendants not obstructed their communications, mis-classified their status, delayed or rejected their payments, or assessed unlawful hazard insurance charges; (g) to reimburse all Plaintiffs for incidental and consequential losses suffered as a result of Defendants' conduct, including all statutory damages and rights permitted under the applicable statutes, and (h) to pay the attorneys fees and costs of the Plaintiffs' counsel herein.

## THE PARTIES

8.  Plaintiffs MARK S. GURALNICK and SUZANNE GURALNICK are husband and wife residing at 31 Treebark Terrace in the Township of Voorhees, County of Camden, and State of New Jersey.

9.  Defendant WELLS FARGO & COMPANY, trading as Wells Fargo Mortgage and/or Wachovia Mortgage, is a banking corporation chartered in the state of Delaware, which conducts regular and ongoing business in and throughout the State of New Jersey, with a principal office at 420 Montgomery Street, San Francisco, CA 94163.

10.  Defendant WELLS FARGO MORTGAGE, trading as Wachovia Mortgage, is a business entity, affiliated with Wells Fargo & Company, and trading under its auspices, which conducts regular and ongoing business in and throughout the State of New Jersey, with a principal office at 420 Montgomery Street, San Francisco, CA 94163.

11.  Defendant WACHOVIA CORPORATION, trading as Wachovia Bank, is a banking corporation, chartered in the State of North Carolina, which does regular and ongoing business throughout the state of New Jersey, and which maintains a business headquarters at One Wachovia Center, Charlotte, North Carolina.

12. Defendant WACHOVIA MORTGAGE trading as Wells Fargo Mortgage, is a business entity, affiliated with Wells Fargo & Company and/or Wachovia Corporation, and trading under its/their auspices, which conducts regular and ongoing business in and throughout the State of New Jersey, with a principal office at One Wachovia Center, Charlotte, North Carolina.

13. Defendant XAVIER PEREZ is, on information and belief, a "customer service supervisor" for Wells Fargo Mortgage and/or Wachovia Mortgage, who identified himself as such person, with such name and such title on February 11, 2013, on which date, the said Mr. Perez promised to resolve all of Plaintiffs' continuously repeated complaints by investigating the issues and calling Plaintiffs back at precisely 5:00 p.m. Eastern Time. Said Defendant failed and refused to participate in the scheduled phone appointment, and when Plaintiff telephoned him, Plaintiff was relegated to a voice mail. Plaintiff left a detailed message and said Defendant has never returned the call. The said XAVIER PEREZ is thus one of the many employees of Defendants Wells Fargo and Wachovia whose deceitful, dishonest, unlawful and reckless behavior damaged the Plaintiffs and who represents the pattern of mismanagement, open dishonesty and gross negligence perpetuated by Defendants' customer service personnel.

14. Defendants ABC CORPORATION, XYZ CORPORATION, JOHN DOES 1 through 50 and JANE DOES 1 through 50, are fictitious names for the as-yet-unidentified business entities, including corporations, professional corporations, partnerships, limited partnerships, limited liability companies, and other business enterprises, as well as all individual persons, both male and female, who are liable or partly liable to the Plaintiffs for the acts, actions, activities, omissions, events and circumstances described in this Complaint. Plaintiff reserves the right to amend this Complaint to join the actual business defendants and individual defendants by their true names once discovered, with all such amendments relating back to the original date of filing hereof.

15.  This court has jurisdiction over defendants, who are corporations authorized to do business in the State of New Jersey, doing sufficient and continuing business in the State of New Jersey, having minimum contacts with the State of New Jersey, and otherwise intentionally availing themselves of the markets within the State of New Jersey, through the promotion, sale, marketing, and distribution of its/their products and services in the State of New Jersey, so as to render the exercise of jurisdiction by the courts of the State of New Jersey permissible under traditional notions of fair play and substantial justice. The claims asserted in this action have sufficient connection with the State of New Jersey to justify the application of New Jersey law to all claims asserted in this complaint.

16. Venue is proper in this Court because Defendants perform substantial and continual business in this county and have and continue to receive substantial compensation from the performance of business in this county; because Plaintiffs are residents of this county and their real estate which a subject of this action is situate in this county, and because at least one of the other Defendants named herein is based in this county.

## CLASS ALLEGATIONS

17.  The putative class consists of all New Jersey homeowners whose properties are subject to, or encumbered by, mortgage loans and notes payable to one or more of the Defendants herein, and who have ever filed for bankruptcy and then terminated their bankruptcy actions, and who have ever been assessed hazard insurance charges for unnecessary insurance coverage imposed by Defendants despite the fact that Plaintiffs have remained continuously covered by their own homeowner's insurance.  The class is defined by those such homeowners who have been unable to extricate their accounts from "bankruptcy status" with Defendants and have therefore been continuously assessed unnecessary charges while being barred from making payments or from otherwise communicating meaningfully with customer service agents.

18. The class is believed to consist of more than one thousand homeowners throughout the State of New Jersey and is so numerous that joinder whether otherwise required or permitted, is impracticable. The exact number of class members is unknown to plaintiff, but is believed to be in excess of one thousand.

19. There are questions of law or fact common to the members of the class which predominate over any questions affecting only individual members and which make class certification appropriate in this instance, including:

A.   Whether Defendants failed to accept and post mortgage payments sought to be made by Plaintiffs and other class members after bankruptcy actions were terminated;

B.   Whether Defendants unnecessarily maintained homeowners in bankruptcy status, and deprived them of payment opportunities, customer service communications, and other ordinary transactions with Defendants *after* the homeowners' bankruptcies were dismissed or withdrawn;

C.   Whether Defendants unlawfully assessed charges for hazard insurance on residential properties that were already insured, and then refused to communicate with homeowners or to acknowledge documentary proof of prior coverage;

D.   Whether Defendants assessed late charges, penalties and other fees and assessments on outstanding payments claimed to be owed by Plaintiffs and other class members which had, in fact, been previously tendered in a form or manner which Defendants were unwilling to accept.

E.   Whether Defendants imposed increased interest charges, or otherwise permitted interest to accrue against unpaid balances, calculated from the date on which Plaintiffs and other class members tendered payments which were then rejected by the Defendants.

F.   Whether Defendants' failure to accept mortgage payments, to post such payments, and to credit the accounts of Plaintiffs and other class members accordingly was done purposefully and intentionally;

G.   Whether Defendants were unjustly enriched by refusing to accept payments, but rather imposing late fees, accrued interest, and other penalties against Plaintiffs and other class members who actually made, or tried to make, timely payments.

H.   Whether Defendants' conduct violates the New Jersey Consumer Fraud Act.

I.   Whether Defendants' conduct violates the New Jersey Unfair Trade Practices Act.

J.      Whether the imposition of a constructive trust is appropriate.

K.      Whether Plaintiffs and other class members sustained damages and the proper measure of damages;

L.      Whether the Defendants' conduct was fraudulent;

M.      Whether Defendants profited from their conduct, and the extent to which they profited, and whether Plaintiffs and other class members are entitled to a complete or partial disgorgement of those profits.

N.      Whether the Defendants' conduct renders them liable to the Plaintiffs and the members of the Class for punitive damages.

20.  The claims asserted by the Plaintiffs herein are typical of the claims of the members of the Class.

21. The named Plaintiffs, MARK S. GURALNICK and SUZANNE GURALNICK, will fairly and adequately protect the interest of the members of the Class and has retained attorneys experienced in class and complex litigation as their counsel.

22. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

A.      It is economically impracticable for most members of the Class to prosecute an individual action;

B.      When the liability of the defendants has been adjudicated, claims of all the members of the Class can be determined by the court; and

C.      Litigation of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to the individual Class members, which would substantially impair or impede the ability of other Class members to protect their interests.

23. Class certification is also appropriate because the defendants have acted on grounds generally applicable to the Class, making equitable and/or injunctive relief with respect to Plaintiffs MARK S. GURALNICK and SUZANNE GURALNICK and the members of the Class appropriate.

## **FACTUAL BACKGROUND**

24. Paragraphs 1 through 23 are incorporated by reference as though the same were set forth below at length.

25. In or about April of 2012, Plaintiffs filed for protection under Chapter 13 of the United States Bankruptcy Code. Their bankruptcy action, filed in the U.S. Bankruptcy Court for the District of New Jersey, named Defendant Wells Fargo Corporation and its alter egos as creditors with respect to the Plaintiffs' outstanding residential mortgage loan.

26. During the course of the bankruptcy and for several months following the commencement of the action, Plaintiffs continued to pay their mortgage payments. At some point thereafter, Plaintiffs stopped making payments to Wells Fargo but signaled, through their counsel, that they intended to re-affirm the mortgage or otherwise satisfy the terms of the mortgage loan. The key objective of the Chapter 13 bankruptcy action was to facilitate the repayment of a substantial IRS lien, and Plaintiffs' Chapter 13 plan provided that Wells Fargo's loan would be satisfied pursuant to its terms.

27. In or about December of 2012, Plaintiffs voluntarily dismissed their bankruptcy action, determining that they would like to work directly with tax agents to pay their IRS liability. Immediate notice of the dismissal of the bankruptcy was given by Plaintiffs directly to Defendants, and this notice was delivered in the form of several telephone calls and several letters that were both mailed and faxed to Defendants' offices. A copy of the dismissal order issued by the U.S. Bankruptcy Court was also provided.

28. Starting immediately thereafter, Plaintiffs sought to bring their mortgage account current. Plaintiffs telephoned Defendants, wrote to them, faxed and mailed letters to them, and followed every protocol suggested by Defendants in an effort to bring their account current, on each occasion offering to pay a single lump sum or several large installments over a short period of time to cure the mortgage arrearage (now estimated at approximately $20,000).

29.  Despite these good faith efforts by the Plaintiffs, Defendants characteristically, and consistent with their long-standing habit of inefficient customer service, advised Plaintiffs that they could not make payments until their account was "reinstated" and until the account was removed from their "bankruptcy status," and transferred out of their "bankruptcy department." Plaintiffs advised that they wanted to minimize their exposure to additional late charges, surcharges and other penalties; that they wanted to avoid any risk of foreclosure insofar as the bankruptcy stay was now lifted, and that they wanted to restore their credit standing with Wells Fargo by immediately bringing the account current; yet, time and time again, Wells Fargo and its agents refused to accept payment, refused to direct the Plaintiffs, refused to acknowledge the dismissal of the bankruptcy action; refused to return phone calls or to respond to letters or faxes; refused to "reinstate" the loan or to transfer it out of the so-called "bankruptcy department." Time and time again, Wells Fargo openly and defiantly mis-directed the Plaintiffs, shuffled them from one inattentive or ill-trained customer service representative to another, or falsified a scheme to escalate Plaintiffs' phone calls in order to lead Plaintiffs to believe that their calls were being managed by a supervisor, when, in fact, no manager or supervisor ever oversaw the issues or claims presented herein.

30.  During this period of time, while Plaintiffs continued in their hopeless attempts to pay their mortgage and bring their account current, and in their time-consuming efforts to secure the cooperation of – or even the meaningful communication with – Wells Fargo's agents, Plaintiffs discovered that Wells Fargo had assessed additional charges, during the course of their bankruptcy action, for unnecessary hazard insurance on Plaintiffs' home, on the false presumption that the home was uninsured. When Plaintiffs subsequently and repeatedly faxed proof of coverage to Wells Fargo, Defendants simply refused to acknowledge the fax, refused to communicate, and refused to reverse the improper, unauthorized and unlawful charges for hazard insurance.

31.  In perhaps the most abusive and deceptive practice by Wells Fargo, Plaintiff Mark S. Guralnick was transferred to a so-called supervisor, Defendant Xavier Perez, on February 11, 2013, who feigned an interest in Plaintiff's complaints, purported to ask questions and collect responses, and then promised to fully investigate and resolve the issues. So ostensibly committed to resolution was this faking Defendant that he scheduled a follow-up phone conference with Plaintiff for later that day, February 11, 2013. Defendant Perez – if, in fact, that is his real name – then failed to return the phone call at the scheduled hour for the pre-arranged phone call; failed to respond to Plaintiff's call minutes later; and has continuously failed and refused to communicate with the Plaintiffs since February 11, 2013. The time devoted to communications with Xavier Perez alone caused Plaintiffs substantial damages in the consumption of valuable work time that cannot now be recovered.

32.  During the period of time that Plaintiffs sought to restore their mortgage and pay their mortgage bills, Defendants precipitously declared Plaintiffs' payments unacceptable, imposed late charges, additional interest and/or other penalties and fees, refused to stop imposed hazard insurance charges, and then – absurdly and inexplicably – embarked on a pattern of avoiding phone calls and correspondence from Plaintiffs. This pattern was engineered, orchestrated and facilitated with the purpose of increasing Plaintiffs' indebtedness to Defendants, subjecting Plaintiffs to additional charges and costs, and ultimately bolstering the amount of the overdue balance which Plaintiffs were obligated to pay.

33.  Moreover, because of Defendants' obstructive, dilatory, elusive and non-communicative conduct, and because Defendants' failure to accept payments from the Plaintiffs meant that Plaintiffs' local property tax bills were not being paid, Plaintiffs' escrow balance decreased, and their tax liability for local taxes increased due to nonpayment, forcing Plaintiffs to incur additional tax penalties, late charges, and other costs and exposure their home to tax foreclosure proceedings.

34. Defendants then avoided communications with the Plaintiffs, refusing to assist Plaintiffs through their purported customer service agents, denying receipt of the payments that they had indeed and in fact received, and refusing to accept further payments to bring the account current.

35. Continuing efforts to secure the cooperation of Defendants' customer service personnel was unsuccessful as Defendants' representatives manifested their intentions to continue their unlawful practice described above for the thousands of mortgage loan customers they had in the State of New Jersey.

36. On information and belief, Defendants' practice has become widespread throughout the State of New Jersey, and transcends all online banking, mortgage handling, credit management and consumer assistance policies undertaken by the consolidated Wells Fargo/Wachovia business enterprises in this State.

37. The factual background provided herein, so far as it is personal to the specific Plaintiffs named herein as class representatives, is, in fact, a representative scenario of the experiences suffered by all class members and thus fairly and accurately characterizes the process under which Plaintiffs and other class members have been damaged by Defendants' dilatory and elusive scheme of delaying or avoid post-bankruptcy reinstatements, refusing payment tenders, and applying unlawful hazard insurance charges during the course of bankruptcy actions..

## COUNT ONE

38. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 37 above as if fully set forth here.

39. The mortgage services at issue in this cause are "merchandise" within the scope of the Consumer Fraud anAct, N.J.S.A. 56:8-1(c).

40. In contracting to lend money to the Plaintiffs and other class members herein, and in taking mortgages in their residential properties subject to mortgage agreements and notes, and in

thereupon engaging in the conduct described above, Defendants committed an unconscionable commercial practice, deception, falsity and/or misrepresentation in connection with the payment of mortgage loans by their New Jersey mortgage customers in that Defendants knew that such payments, if rejected, or if subject to requirements not otherwise authorized by law or contract and then rejected for noncompliance, would be deemed late, thus subjecting Plaintiffs and other class members to late fees, surcharges, accrued interest and other penalties and the costs and risks associated with foreclosure actions.

41. Defendants further committed an unconscionable commercial practice, deception, falsity and/or misrepresentation in connection with the management and servicing of mortgage loans by assessing charges for hazard insurance coverage that was not necessary and was not authorized by Plaintiffs, and by perpetuating a system of requesting proof of coverage from homeowners and then presuming non-compliance or ignoring evidence of pre-existing insurance coverage.

42. As a result of Defendants' unlawful conduct, Plaintiffs have suffered an ascertainable loss of money and property in excess of the jurisdictional limits of this court as follows:

A. Plaintiffs have lost their credit position and financial standing based on reports of derogatory credit information by the Defendants.

B. Plaintiffs have lost money from the imposition of excessive and unlawful late charges, surcharges, accrued interest, cancelled endorsements, other penalties and interest, attorneys fees and foreclosure-related costs, and

C. Plaintiffs have now been exposed to the threat and risk of foreclosure despite not actually being in genuine default of their payment obligations.

D. Plaintiffs are have been precluded from paying their current balance due to the Defendants through a systematic blockage of communication;

E. Plaintiffs have suffered unlawfully inflated account balances based on improperly assessed hazard insurance charges and/or have unwittingly paid those charges because of Defendants' improper assessments thereof.

43. In the alternative, Plaintiffs have no adequate remedy at law, since the damages caused by Defendants' conduct are difficult, if not impossible, to ascertain, and Defendants' acts, if allowed to continue, will cause plaintiff irreparable injury.

44. Further, to obtain redress at law, plaintiff will be forced to institute multiple actions.

**WHEREFORE**, Plaintiffs demand judgment, on their own behalf and on behalf of all class members similarly situated, against the Defendants named herein, individually, jointly, severally, and in the alternative, as follows:

A.  Certifying the action as a class action pursuant to R. 4:32-2 with plaintiffs as the representative of the Class;

B.  Awarding Plaintiffs and the Class their damages for the wrongful acts complained of;

C.  Awarding Plaintiffs and the Class interest on all payments previously tendered by them in satisfaction of current mortgage bills, retroactive to the dates of the payments made.

D.  Awarding Plaintiffs and the Class their costs and disbursements incurred in connection with this action, including reasonable attorney's and expert witness fees.

E.  Finding that the acts and/or omissions of Defendants constitute multiple instances of unlawful practices in violation of N.J.S.A. 56:8-1 et seq.;

F.  Permanently enjoining Defendants or anyone acting in active concert or participation with them or acting on their behalf from engaging in, continuing to engage in, or doing any acts or practices in violation of the Consumer Fraud Act, and the regulations promulgated thereunder, including, but not limited to, the acts and practices alleged in this Complaint;

G.  Further enjoining the Defendants from classifying Plaintiffs in "bankruptcy status," and from sidetracking their accounts in a so-called "bankruptcy department;"

H.  Compelling the Defendants to reinstate Plaintiffs' loans, to accept the necessary payments to bring their account balance current, to reverse all late charges, accrued interest, penalties, surcharges or other assessments against the account, and enjoining them from continuing to reject Plaintiffs' payments and from continuing to assess such fees, charges and interest.

I.  Permanently enjoining the Defendants from charging the Plaintiffs for unauthorized hazard insurance, where Plaintiffs have maintained pre-existing homeowners insurance coverage; declaring that such practice is unlawful and

unconscionable, and requiring Defendants to reverse all such improper hazard insurance payments, crediting Plaintiffs' accounts accordingly, and further crediting Plaintiffs' account for any interest, late fees, and surcharges attributable to the hazard insurance payments.

J.      Requiring Defendants to restore all escrow balances on Plaintiffs' mortgage accounts, and to draw therefrom the apprpriate sums necessary to pay local property taxes on Plaintiffs' account, and to pay such taxes promptly and to file and serve an accounting thereof.

K.      Directing defendants to give to Plaintiff an accounting of all payments received by their cashiering departments, all payments endorsed, all endorsements cancelled, all payments posted, all payments rejected, all interest accrued since the date of the first rejected payment, all late charges assessed, and all other late fees, penalties and assessments imposed on Plaintiff's account, commencing March 1, 2012 until the present.

L.      Directing defendants at their own expense to restore to any affected person, whether specially named in this Complaint or not, any money or property acquired by means of any practice alleged here to be unlawful under N.J.S.A. 56:8-8;

M.      Assessing the maximum statutory civil penalty against defendants for each and every violation of the Consumer Fraud Act in accordance with N.J.S.A. 56:8-13

N.      Directing the assessment of costs and fees, including attorney's fees, against defendants for the use of the State of New Jersey as authorized by N.J.S.A. 56:8-11 and N.J.S.A. 56:8-19; and

O.      Awarding treble damages, or other exemplary damages as permitted by law.

P.      Granting such other relief as the interests of justice may require.

## COUNT TWO

45. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 44 above as if fully set forth here.

46. The unfair and deceptive trade acts and practices of Defendants have directly, foreseeably, and proximately caused damages and injury to the Plaintiffs and to the other members of the Class in amounts yet to be determined.

47. The actions and failures to act of Defendants, including the intentional failure to accept payments, reinstate Plaintiffs' account and to communicate with Plaintiffs, the intentional imposition of unlawful and unauthorized hazard insurance charges, and the intentional acts of assessing late fees, interest and other charges on the said accounts, constitute acts, uses, or

employment by Defendants of unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, or the knowing, concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in violation of the New Jersey Unfair Trade Practices Act, N.J. Stat. Ann. §§ 56:8-1 et seq.

48. By reason of Defendants' unlawful conduct in violation of N.J. Stat. Ann. § 56:8-2, Plaintiffs and the other members of the Class have suffered ascertainable losses of money and property in amounts yet to be determined.

**WHEREFORE,** Plaintiffs demand judgment, on their own behalf and on behalf of all class members similarly situated, against the Defendants named herein, individually, jointly, severally, and in the alternative, as follows:

A.   Certifying the action as a class action pursuant to R. 4:32-2 with plaintiff as the representative of the Class;

B.   Awarding Plaintiffs and the Class their damages for the wrongful acts complained of;

C.   Awarding Plaintiff and the Class interest on all payments previously tendered by them in satisfaction of current mortgage bills, retroactive to the dates of tender;

D.   Awarding Plaintiff and the Class their costs and disbursements incurred in connection with this action, including reasonable attorney's and expert witness fees.

E.   Awarding all damages recoverable under the New Jersey Unfair Trade Practices Act, N.J. Stat. Ann. §§ 56:8-1 et seq.;

F.   Granting equitable and/or injunctive relief as permitted by law or equity, including attaching, impounding or imposing a constructive trust upon or otherwise restricting the proceeds of Defendant's ill-gotten funds, and upon all hazard insurance funds, to ensure Plaintiffs and the other members of the Class have an effective remedy;

G.   Awarding all relief delineated in the Prayer for Relief following Count One hereof; and

H.   Granting such other and further relief as the court deems just and proper.

## COUNT THREE

49. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 48 above as if fully set forth here.

50. Defendants have been unjustly enriched through the enhancement of loan balances purportedly owed by the Plaintiffs, and by the assessment of insurance charges, late fees, pealnties, other surcharges and accrued interest.

51. In all such cases, Defendants have been unjustly enriched at the expense of, and to the detriment of, the Plaintiffs herein and other class members similarly situated.

52. As a result, Defendants will be unjustly enriched if they are allowed to maintain the inflated and augmented balances on Plaintiffs' accounts, and if they are permitted to protract Plaintiffs' perceived bankruptcy status while rejecting payments in order to inflate the balances due and assess improper insurance charges, together with additional late fees and costs.

53. The Plaintiffs and the members of the Class have no adequate remedy at law.

54. By reason of the foregoing, Plaintiffs and the members of the Class have been damaged in an amount to be determined at the trial of this matter.

**WHEREFORE,** Plaintiffs demand judgment, on their own behalf and on behalf of all class members similarly situated, against the Defendants named herein, individually, jointly, severally, and in the alternative, as follows:

A. Certifying the action as a class action pursuant to R. 4:32-2 with plaintiff as the representative of the Class;

B. Awarding Plaintiffs and the Class their damages for the wrongful acts complained of;

C. Awarding Plaintiff and the Class interest on all payments previously tendered by them in satisfaction of current mortgage bills, retroactive to the dates of tender.

D. Awarding Plaintiff and the Class their costs and disbursements incurred in connection with this action, including reasonable attorney's and expert witness fees.

E.    Awarding all damages necessary to cure the unjust enrichment complained of herein.

F.    Awarding all relief delineated in the Prayer for Relief following Counts One and Two hereof; and

G.    Granting such other and further relief as the court deems just and proper.

## COUNT FOUR

55. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 54 above as if fully set forth here.

56. In connection with Defendants' pattern of conduct as described above, Defendants exercised dominion and control over mortgage loans and accounts in which Plaintiffs and other members of the class had an interest.

57. Defendants' conduct deprived Plaintiffs and the other members of the Class of their credit standing and financial position and of their proper loan balances, and such conduct burdened Plaintiffs and other members of the Class with insurance charges, late fees, assessments, surcharges, accrued interest and other penalties, without lawful justification.

58. By reason of the foregoing, Plaintiffs and the other members of the Class have been irreparably harmed and damaged in an amount to be determined at the trial of this matter.

**WHEREFORE**, Plaintiffs demand judgment, on their own behalf and on behalf of all class members similarly situated, against the Defendants named herein, individually, jointly, severally, and in the alternative, as follows:

A.    Certifying the action as a class action pursuant to R. 4:32-2 with plaintiff as the representative of the Class;

B.    Awarding Plaintiffs and the Class their damages for the wrongful acts complained of;

C.    Awarding Plaintiff and the Class interest on all payments previously tendered by them in satisfaction of current mortgage bills, retroactive to the dates of tender;

D.    Awarding Plaintiff and the Class their costs and disbursements incurred in connection with this action, including reasonable attorney's and expert witness fees.

E.      Awarding compensatory damages for all actual, incidental and consequential losses sustained herein.

F.      Awarding all relief delineated in the Prayer for Relief following Counts One and Two and Three hereof; and

G.      Granting such other and further relief as the court deems just and proper.

## COUNT FIVE

59. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 58 above as if fully set forth here.

60. Defendants' pattern of protracting Plaintiffs' bankruptcy status, declining communications, avoiding resolution, refusing payment, and failing to reinstate the loan, compounded by their pattern of applying redundant and unauthorized hazard insurance charges while Plaintiffs were in bankruptcy status, represents a fraudulent misrepresentation of fact against the Plaintiffs and other members of the Class herein.

61. Plaintiffs and other members of the Class justifiably relied on the oral and written promises and representations of the Defendants in remitting their mortgage payments, which said promises and representations were knowingly false.

62. At all pertinent times, Defendants intentionally misled the Plaintiffs and other class members, and they did so with reckless disregard of the consequences, with total indifference to the effect on the Plaintiff's financial standing, with malice and scienter.

63. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs and other class members were damaged, as more fully explained above, and said damages are continuing and multiplying.

64. The conduct of the Defendants was, and continues to be, under the circumstances, especially egregious, repugnant, outrageous,and contrary to public policy.

**WHEREFORE,** Plaintiffs demand judgment, on their own behalf and on behalf of all class members similarly situated, against the Defendants named herein, individually, jointly, severally, and in the alternative, as follows:

A.     Certifying the action as a class action pursuant to R. 4:32-2 with plaintiff as the representative of the Class;

B.     Awarding Plaintiffs and the Class their damages for the wrongful acts complained of;

C.     Awarding Plaintiff and the Class interest on all payments previously tendered by them in satisfaction of current mortgage bills, retroactive to the dates of tender;

D.     Awarding Plaintiff and the Class their costs and disbursements incurred in connection with this action, including reasonable attorney's and expert witness fees.

E.     Awarding compensatory damages for all actual, incidental and consequential losses sustained herein.

F.     Awarding punitive damages;

G.     Awarding all relief delineated in the Prayer for Relief following Counts One through Four hereof, inclusive; and

H.     Granting such other and further relief as the court deems just and proper.

## COUNT SIX

65. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 64 above as if fully set forth here.

66.  Defendants are equitably estopped, pursuant to law, from declaring Plaintiffs and other members of the Class in default or otherwise delinquent in their mortgage obligations, insofar as Defendants themselves designed the system by which Plaintiffs remit their mortgage payments and instructed Plaintiffs to abide thereby.

67. Defendants are furthermore equitably estopped from declaring Plaintiffs and other members of the Class in default or otherwise delinquent in their mortgage obligations because Plaintiffs sought to make payments to to cure any perceived delinquencies, but Defendants resisted and blocked those efforts, choosing instead to bolster Plaintiffs' debt with additional charges, fees, and penalties.

68. Furthermore, it is the Defendants' bureaucratic failure to communicate with the Plaintiffs, to adjust Plaintiffs' accounts, to respond to Plaintiffs' good-faith efforts to resolve

problems, to post payments and credit accounts correspondingly, and to give timely notice to the Plaintiffs of their intentions that has subjected the Plaintiffs to an endless cycle of customer service inquiries, complaints and aborted resolutions and other impersonal communications, compounding an inaccurate and unlawful characterization of the Plaintiffs' payment history and account balance.

**WHEREFORE,** Plaintiffs demand judgment, on their own behalf and on behalf of all class members similarly situated, against the Defendants named herein, individually, jointly, severally, and in the alternative, as follows:

A. Certifying the action as a class action pursuant to R. 4:32-2 with plaintiff as the representative of the Class;

B. Awarding Plaintiffs and the Class their damages for the wrongful acts complained of;

C. Awarding Plaintiff and the Class interest on all payments previously tendered by them in satisfaction of current mortgage bills, retroactive to the dates of tender;

D. Awarding Plaintiff and the Class their costs and disbursements incurred in connection with this action, including reasonable attorney's and expert witness fees.

E. Declaring that Defendants are equitably estopped from refusing payment in the manner in which Plaintiffs seek to make payment, are estopped from protracting Plaintiffs' bankruptcy status where no bankruptcy action continues to exist; are estopped from assessing hazardous insurance charges where pre-existing insurance coverage was already in effect, and are further estopped from the other actions, positions and declarations described above.

F. Awarding compensatory damages for all actual, incidental and consequential losses sustained herein.

G. Awarding all relief delineated in the Prayer for Relief following Counts One through Five hereof, inclusive; and

H. Granting such other and further relief as the court deems just and proper.

## COUNT SEVEN

69. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 68 above as if fully set forth here.

70.  Plaintiffs entered into bilateral mortgage agreements and repayment agreements with the Defendants herein, in each case promising to repay mortgage loans on a fixed schedule in exchange for the approval of a loan.

71.  In each such case, implied and/or expressed in the aforestated agreements were Defendants' commitment to accept, receive, post and properly credit Plaintiff's accounts, and to abide by the interest rates, late fee assessment policies, and other billing practices agreed upon by the parties.

72.  Defendants have breached the terms of these mortgage agreements and loan agreements, and in so doing, have damaged the Plaintiffs and other members of the class financially.

**WHEREFORE,** Plaintiffs demand judgment, on their own behalf and on behalf of all class members similarly situated, against the Defendants named herein, individually, jointly, severally, and in the alternative, as follows:

A.     Certifying the action as a class action pursuant to R. 4:32-2 with plaintiff as the representative of the Class;

B.     Awarding Plaintiffs and the Class their damages for the wrongful acts complained of;

C.     Awarding Plaintiff and the Class interest on all payments previously tendered by them in satisfaction of current mortgage bills, retroactive to the dates of tender;

D.     Awarding Plaintiff and the Class their costs and disbursements incurred in connection with this action, including reasonable attorney's and expert witness fees.

E.     Declaring that Defendants' policies and practices are in breach of the mortgage loan agreements and credit terms agreed upon by the parties.

F.     Awarding compensatory damages for all actual, incidental and consequential losses sustained herein.

G.     Awarding all relief delineated in the Prayer for Relief following Counts One through Seven hereof, inclusive; and

H.     Granting such other and further relief as the court deems just and proper.

## **COUNT EIGHT**

73. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 72 above as if fully set forth here.

74. Defendants' actions are designed to inflate the indebtedness of the Plaintiffs, while increasing the book value of the Defendants' accounts receivable.

75. Defendants' actions are designed to impair the creditworthiness of the Plaintiffs while exposing them to the risks, the cost, and the penalties of foreclosure.

76. Plaintiffs and Defendants do not agree as to the rights afforded each of them under the terms of their mortgage loans, and the extent to which Defendants can protract bankruptcy status, refuse reinstatement, refuse payments from mortgagors, and assess hazard insurance charges without express homeowner approval.

77. Judicial supervision is requested and required to remedy this disagreement.

**WHEREFORE,** Plaintiffs demand judgment, on their own behalf and on behalf of all class members similarly situated, against the Defendants named herein, individually, jointly, severally, and in the alternative, as follows:

A.   Certifying the action as a class action pursuant to R. 4:32-2 with plaintiff as the representative of the Class;

B.   Awarding Plaintiffs and the Class their damages for the wrongful acts complained of;

C.   Awarding Plaintiff and the Class interest on all payments previously tendered by them in satisfaction of current mortgage bills, retroactive to the dates of tender;.

D.   Awarding Plaintiff and the Class their costs and disbursements incurred in connection with this action, including reasonable attorney's and expert witness fees.

E.   Entering a declaratory judgment that Defendants' policies, practices and patterns are contrary to law, unjustified in the circumstances, or otherwise barred by legal and equitable principles;

F.   Compelling the Defendants to accept and post all mortgage payments previously tendered, irrespective of form and manner of payment, and to retroactively credit all accounts;

G.   Entering injunctive relief, including such preliminary, temporary and permanent injunctions as will effectuate the cessation of Defendants' unlawful practices and the eradication of their unlawful policies.

H.   Awarding compensatory damages for all actual, incidental and consequential losses sustained herein.

I.   Awarding all relief delineated in the Prayer for Relief following Counts One through Eight hereof, inclusive; and

J.   Granting such other and further relief as the court deems just and proper.

MARK S. GURALNICK
*A Professional Corporation*

By: _____
Mark S. Guralnick, Esq.
*Attorney for the Plaintiffs*

DATED: February 15, 2013

## JURY DEMAND

Plaintiffs, MARK S. GURALNICK and SUZANNE GURALNICK, hereby demand a trial by a jury on all of the triable issues of this Complaint, pursuant to R. 1:8-2 (b) and R. 4:35-1 (a).

MARK S. GURALNICK
*A Professional Corporation*

By: _____
Mark S. Guralnick, Esq.
*Attorney for the Plaintiffs*

DATED:   February 15, 2013

## DESIGNATION OF TRIAL COUNSEL

*PLEASE TAKE NOTICE* that, pursuant to Rule 4:25-4, Mark S. Guralnick,

Esquire, is hereby designated as trial counsel for the Plaintiffs in the above matter.


**MARK S. GURALNICK**
*A Professional Corporation*


By: _____
    **Mark S. Guralnick, Esq.**
    *Attorney for the Plaintiffs*

## CERTIFICATION OF NO OTHER ACTIONS

Pursuant to Rule 4:5-1, it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of our knowledge or belief. Further, to the best of the our knowledge and belief, no other action is presently contemplated. Other than the parties set forth in this pleading, and other than the Defendants to be joined as replacements for the fictitiously named parties herein, we know of no other parties that should be joined in the above action. In addition, we recognize the continuing obligation of each party to file and serve on all parties and the Court an amended certification if there is any change in the facts stated in this original certification.

MARK S. GURALNICK
*A Professional Corporation*

By: _____

**Mark S. Guralnick, Esq.**
*Attorney for the Plaintiffs*

DATED:   February 15, 2013

## NOTICE IN LIEU OF SUBPOENA

Pursuant to <u>R</u>.1:9-1 and <u>R</u>. 1:9-2, you are hereby requested to produce, within 30 days of the date of service of this Complaint upon you, the following documents:

1.  A list of the names and addresses of all New Jersey customers of any Defendant named herein, who has mortgaged any New Jersey property to any Defendant herein, and from whom any Defendant herein has received mortgage payments in the last 36 months.

2.  A complete statement of all payments received from the Plaintiffs herein on Mortgage Loan No. 0043790351 during calendar year 2012 and 2013, including, but not limited to, all checks, wire transfers, and other payments recieved by Defendant's cashiering department and subsequently returned to the Plaintiffs by the Defendants.

3.  Copies of all negotiable instruments issued by Plaintiffs to Defendants, endorsed by Defendants and either paid, dishonored or returned, including but not limited to all such instruments in which the endorsement was cancelled by the Defendants.

4.  Copies of all correspondence sent by Plaintiffs to Defendants, and by Defendants, or any of their agents or representatives to Plaintiffs, in the last 180 days.

5.  Copies of all the transcripts and tapes of all recordings of all phone calls received by Defendant's customer service departments and/or any other department, division, or part of the Defendants' business, dealing with Plaintiffs' mortgage loan account in any respect.

6.  Copies of all computer entries, agent notes, transcripts, records, minutes and logs of calls made by Plaintiffs to any person, agent, employee, representative, department, division or section of the Defendants during the last 180 days.

7.  Copies of all agreements, contracts, or other documents by which you contend Defendants were authorized to protract the Plaintiffs' bankruptcy status beyond the actual date of dismissal of Plaintiffs' bankruptcy action.

8.  Copies of a ledger and/or statement of account identifying and isolating all late payments or other surcharges against Plaintiffs' mortgage loan account in the last 180 days.

9.  Copies of a ledger and/or statement of account identifying and isolating all interest accruing on Plaintiffs' mortgage account in the last 180 days.

10.     Copies of a ledger and/or statement of account identifying and isolating all hazard insurance payments made by Defendants on behalf of Plaintiffs, or with respect to Plaintiffs' account, detailing the dates and amounts thereof, during the last 15 months.

11.     Copies of all policies, rules, regulations, statements of policy, protocols, procedures or other materials by which Defendants have declared the method and manner in which they will accept payments from mortgage loan customers in the event of a delinquency, a default, bankruptcy or a dispute over payment.

12.     Copies of all policies, rules, regulations, statements of policy, protocols, procedures or other materials by which Defendants have declared the method and manner in which they will assess hazard insurance on mortgage loan customers in the event of a delinquency, a default, bankruptcy or a dispute over payment, or for any other reason.


                                              **MARK S. GURALNICK**
                                              *A Professional Corporation*


                                    By: _____
                                              **Mark S. Guralnick, Esq.**
                                              *Attorney for the Plaintiffs*


DATED:   February 15, 2013

**MARK S. GURALNICK**
M.P.A., M.F.A., M.B.A., J.D., LL.M., Ph.D.

Member of the Bar in New Jersey,
New York, Florida, Maryland,
Pennsylvania, Massachusetts,
Michigan, Kentucky
and Washington, D.C.

Admitted as a Solicitor of
England, Wales and Scotland

Admitted in Micronesia as an
Attorney of Saipan and the
Northern Mariana Islands

Certified Civil Trial Attorney (NJ)

Certified Matrimonial
Law Attorney (NJ)

Board Certified in
International Law (FL)

Licensed Private Detective (NJ)

Law Offices

# MARK S. GURALNICK

*ATTORNEYS AND SOLICITORS*
800 Cooper Road, Suite 3
Voorhees, NJ 08043
(856) 983-9900
Fax: 1-800-613-2585
Email: msg@guralnicklegal.com





February 15, 2013

Clerk, Superior Court
Camden County Hall of Justice
101 South 5th Street
Camden, New Jersey 08103

    RE:   **Mark S. Guralnick, et al v. Wells Fargo & Company, et al.**

Dear Clerk:

Please find enclosed for filing Plaintiffs Class Action Complaint in the above-referenced matter.

Kindly file the original documents and return time-stamped copies in the enclosed envelope.

Also enclosed is a check in the amount of $200 for the filing fee.

Thank you for your kind attention to this matter.

                Sincerely yours,

                **MARK S. GURALNICK**
                *A Professional Corporation*

                **Mark S. Guralnick, Esq.**

*RECEIVED 2013 FEB 19 AM 9: 14 CIVIL DIVISION MAILROOM*

Enclosures
MSG:km
E:\Guralnick v. Wachovia\MSG v. Wells Fargo (2013)\Cor\To Clerk, Camden County\02-15-13.wpd

**Appendix XII-B1**

2.19.13



# CIVIL CASE INFORMATION STATEMENT
## (CIS)

### Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c),**
**if information above the black bar is not completed**
**or attorney's signature is not affixed**

| FOR USE BY CLERK'S OFFICE ONLY |
|---|
| PAYMENT TYPE: ☑CK ☐CG ☐CA |
| CHG/CK NO. 2030 |
| AMOUNT: 200 |
| OVERPAYMENT: |
| BATCH NUMBER: D 295 |

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| Mark S. Guralnick, Esq. | (856) 983-9900 | Camden |

| FIRM NAME (if applicable) | DOCKET NUMBER (when available) |
|---|---|
| Mark S. Guralnick, A Professional Corporation | L 811-13 |

| OFFICE ADDRESS | DOCUMENT TYPE |
|---|---|
| 800 Cooper Road, Suite 3 Voorhees, NJ 08043 | Class Action Complaint |
| | JURY DEMAND ☑ YES ☐ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
|---|---|
| Mark S. Guralnick and Suzanne Guralnick | Mark S. Guralnick and Suzanne Guralnick v. Wells Fargo & Company, Wells Fargo Mortgage, Wachovia Mortgage, Wachovia Corporation, Xavier Perez, et al. |

| CASE TYPE NUMBER (See reverse side for listing) 508 | IS THIS A PROFESSIONAL MALPRACTICE CASE? ☐ YES ☑ NO |
|---|---|
| | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? ☐ Yes ☑ No | IF YES, LIST DOCKET NUMBERS |
|---|---|

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? ☐ YES ☑ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known) ☐ NONE ☑ UNKNOWN |
|---|---|

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? ☑ Yes ☐ No | IF YES, IS THAT RELATIONSHIP: ☐ EMPLOYER/EMPLOYEE ☐ FRIEND/NEIGHBOR ☐ OTHER (explain) ☐ FAMILIAL ☑ BUSINESS |
|---|---|

DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? ☐ YES ☐ NO

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

FILED

FEB 19 2013

CAMDEN COUNTY SUPERIOR COURT

RECEIVED 2013 FEB 19 AM 9: 14 CIVIL DIVISION FILE ROOM

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? ☐ Yes ☑ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED? ☐ Yes ☑ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE: _[signature]_

# EXHIBIT B

# ReedSmith

Reed Smith LLP
Princeton Forrestal Village
136 Main Street - Suite 250
Princeton, NJ 08540-7839
+1 609 987 0050
Fax +1 609 951 0824
reedsmith.com

Diane A. Bettino
Direct Phone: +1 609 514 5962
Email: dbettino@reedsmith.com

March 8, 2013

*Via telefacsimile and regular mail*

Mark S. Guralnick, Esq,
800 Cooper Road, Suite 3
Voorhees, New Jersey 08043

   Re: *Mark S. Guralnick, et al. v. Wells Fargo & Company, et al.*
     *Docket No.: L-811-13*

Dear Mr. Guralnick:

  As we discussed yesterday, this firm represents the Defendants in the above-referenced matter. This letter shall confirm that I agreed to accept service of the Complaint on behalf of the Defendants on March 7, 2013.

       Very truly yours,

       Diane A. Bettino

cc: Mark S. Melodia, Esquire

# EXHIBIT C

# REDACTED

WORLD SAVINGS BANK, FSB

## ADJUSTABLE RATE MORTGAGE NOTE

### BIWEEKLY PAYMENT

### GDW AVERAGE DEPOSIT ACCOUNT RATE (COST OF SAVINGS) INDEX

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, MY BIWEEKLY PAYMENT AND MY UNPAID PRINCIPAL BALANCE. MY BIWEEKLY PAYMENT INCREASES, MY INTEREST RATE INCREASES AND MY PRINCIPAL BALANCE INCREASES ARE LIMITED. THIS NOTE IS SECURED BY A SECURITY INSTRUMENT OF THE SAME DATE.

LOAN NUMBER:                                          DATE: September 21, 2006

BORROWER(S): MARK S GURALNICK, A MARRIED MAN   sometimes called "Borrower" and sometimes simply called "I" or "me"

PROPERTY ADDRESS: 31 TREEBARK TER, VOORHEES, NJ 08043-3441

1. **BORROWER'S PROMISE TO PAY**
   In return for a loan that I have received, I promise to pay U.S **$277,800.00**, called "Principal," plus interest, to the order of the Lender The Lender is **WORLD SAVINGS BANK, FSB, a FEDERAL SAVINGS BANK,**, ITS SUCCESSORS AND/OR ASSIGNEES, or anyone to whom this Note is transferred.

2. **INTEREST**
   (A)    **Interest Rate**
   Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Initially, I will pay interest at a yearly rate of **6.590%**. The interest rate I will pay may change as described in this Section 2. Interest will be charged on the basis of a 364-day year, divided into 26 segments of two weeks each

   The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note

   (B)    **Interest Change Dates**
   The interest rate I will pay may change on the **13th** day of **November, 2006** and on every other Monday thereafter. Each date on which my interest rate could change is called an "Interest Change Date" The new rate of interest will become effective on each Interest Change Date

   (C)    **Interest Rate Limit**
   My lifetime maximum interest rate limit is **11.950%** called "Lifetime Rate Cap"

SD236A (2004-03-3)                    BIWEEKLY ARM               NJ
                                       Page 1

LENDER'S USE ONLY

001

# REDACTED

**(D) Index**

Beginning with the first Interest Change Date, my interest rate will be based on an "Index." The Index is the weighted average of the interest rates in effect as of the last day of each calendar month on the deposit accounts of the federally insured depository institution subsidiaries ("Subsidiaries") of Golden West Financial Corporation ("GDW"), as made available by GDW. Included in the deposit accounts for purposes of the Index calculation are all of the items and adjustments that GDW uses to calculate the line item currently called "cost of deposits" that appears in its quarterly and annual reports to shareholders as well as in other financial reports publicly distributed by GDW. The Index does not include deposit accounts owned by GDW or its Subsidiaries or other affiliates. The calculation of the Index includes adjustments for the effects of financial instruments related to the deposit accounts and other adjustments determined by GDW in its sole discretion as appropriate to accurately reflect the weighted average of interest rates on the deposit accounts. If an index is substituted as described in Section 2(F) of this Note, the alternative index will become the Index. The most recent Index figure available on each Interest Change Date is called the "Current Index."

**(E) Calculation of Interest Rate Changes**

Lender will calculate my new interest rate by adding **2.650** percentage points, called the "Margin," to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this calculation will be my new "Interest Rate" until the next Interest Change Date.

If Lender fails to utilize the entire interest rate increase to which it is entitled under this Note on any Interest Change Date by failing to add all or part of the allowable Margin to the Current Index, then Lender may add any such allowable Margin to the Current Index on any future Interest Change Date. Lender may not, at a later date, carryover or add interest to which it is not entitled under this Note on any Interest Change Date.

**(F) Alternative Index**

The Lender may choose an alternative index to be the Index if the Index is no longer available. For purposes of this Section 2(F), the Index is not "available" if (a) the Index is for any reason no longer published; or (b) the Lender, in its sole discretion, determines that the Index is calculated in a substantially different manner or based on substantially different information than at the time the Index became applicable to this Note, or (c) applicable laws or regulations prevent the Lender from using the Index to calculate interest under this Note. The selection of the alternative index shall be at Lender's sole discretion. The alternative index may be a national or regional index or another type of index approved by the Lender's primary regulator. The Lender will give me notice of the alternative index.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay Principal and interest by making payments every two weeks.

I will make my first biweekly payment on **October 30, 2006** and every other Monday thereafter. I will make these biweekly payments until I have paid (i) all the Principal and interest; and (ii) any other charges described below that I may owe under this Note, and (iii) any charges that may be due under the Security Instrument. If, on **October 16, 2036**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will maintain a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, and keep sufficient funds in such deposit account to allow Lender to automatically withdraw my biweekly payment on each of the biweekly payment dates stated above. The sole purpose of the deposit account is to ensure payment of the biweekly payments on the due-date of each payment and I instruct and charge Lender to withdraw the amount of each biweekly payment from the deposit account on each due date without any further instructions from me.

**(B) Amount of My Initial Biweekly Payments**

Initially, each of my biweekly payments will be in the amount of U.S. $ **886.18.** This amount will change.

**(C) Payment Change Dates**

My biweekly payment will change as required by Section 3(D) below beginning on the **29th** day of **October, 2007** and every 52 weeks thereafter. Each of these dates is called a "Payment Change Date." My biweekly payment will also change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay the amount of my new biweekly payment every other Monday beginning on each Payment Change Date and as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Payment Changes**

On the Payment Change Date my biweekly payment may be changed to an amount sufficient to pay the unpaid Principal balance, including any deferred interest as described in Section 3(E) below, by the "Modified Maturity Date." The Modified Maturity Date is the date on which this Note will be paid after accounting for acceleration of the payment schedule resulting from biweekly payments rather than the monthly payment schedule used to calculate the Maturity Date described in Section 3(A) above. However, the amount by

# REDACTED

which my payment can be changed will not be more or less than 7-1/2% of the then existing Principal and interest payment. This 7-1/2% limitation is called the "Payment Cap." Furthermore, my payment cannot be decreased on any Payment Change Date if there is any unpaid deferred interest. The Lender will perform this Payment Change calculation at least 50 but not more than 90 days before the Payment Change Date.

**(E)  Deferred Interest; Additions to My Unpaid Principal**
From time to time, my biweekly payments may be insufficient to pay the total amount of biweekly interest that is due. If this occurs, the amount of interest that is not paid each payment, called "Deferred Interest," will be added to my Principal and will accrue interest at the same rate as the Principal.

**(F)  Limit on My Unpaid Principal; Increased Biweekly Payment**
My unpaid Principal balance can never exceed **125%** of the Principal I originally borrowed, called "Principal Balance Cap." If, as a result of the addition of deferred interest to my unpaid Principal balance, the Principal Balance Cap limitation would be exceeded on the date that my biweekly payment is due, I will instead pay a new biweekly payment. Notwithstanding Sections 3(C) and 3(D) above, I will pay a new biweekly payment which is equal to an amount that will be sufficient to repay my then unpaid Principal balance in full on the Maturity Date at the interest rate then in effect, in substantially equal payments.

**(G)  Payment Cap Limitation; Exceptions**
Beginning with the 5th Payment Change Date and every 5th Payment Change Date thereafter, my biweekly payment will be calculated as described in Section 3(D) above except that the Payment Cap limitation will not apply. Additionally, the Payment Cap limitation will not apply on the final Payment Change Date.

**(H)  Notice of Payment Changes**
The Lender will deliver or mail to me a notice of any changes in the amount of my biweekly payment, called "Payment Change Notice," before each Payment Change Date. The Payment Change Notice will include information required by law.

**4.  FAILURE TO MAKE ADJUSTMENTS**
If for any reason Lender fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Lender may, upon discovery of such failure, then make the adjustments as if they had been made on time. I also agree not to hold Lender responsible for any damages to me which may result from Lender's failure to make the adjustment and to let the Lender, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due.  A payment of Principal before it is due is called a "Prepayment". When I make a Prepayment, I will tell the Lender in writing that I am doing so.  The Lender may require that any partial Prepayments be made on the date my regularly scheduled payments are due. If I make a partial Prepayment, there will be no changes in the due dates or amount of my regularly scheduled payments unless the Lender agrees to those changes in writing.  I may pay deferred interest on this Note at any time without charge and such payment will not be considered a "Prepayment" of Principal.  During the first 3 years of the loan term if I make one or more Prepayments that, in the aggregate, exceed $5,000 in any calendar month, I must pay a prepayment charge equal to 2% of the amount such Prepayments exceed $5,000 in that calendar month. After the first 3 years of the loan term, I may make a full or partial Prepayment without paying any prepayment charge.

**6.  MAXIMUM LOAN CHARGES**
If a law which applies to this loan and which sets maximum loan charges is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Lender may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

# REDACTED

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A)   Late Charges for Overdue Payments**

    If the Lender has not received the full amount of any biweekly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Lender. The amount of the charge will be **5.00%** of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

    **(B)   Default**

    I will be in default if (i) I do not pay the full amount of each biweekly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under this Note or the Security Instrument, or (iii) any statement made in my application for this loan was materially false or misleading, or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading.

    **(C)   Default - Change to Monthly Payments**

    If I fail to have sufficient funds in my deposit account to make my biweekly payment on the date my biweekly payment is due on two occasions in any 12 month period or four occasions any time prior to the Maturity Date or if a garnishment, attachment or seizure is made of or against my deposit account, then I will be in default and Lender will have a right, but not a duty, to change my loan for its remaining term to one with payments due monthly instead of biweekly. If the Lender chooses to change my loan to one with payments due monthly, Lender may charge its then current fee for such a change and will provide me with written notice of the change at least 30 days in advance of the date the first monthly payment is due. This notice will also specify the amount of the monthly payment and the date the first monthly payment is due. In such event, interest on the loan balance from the last date interest was paid to the first date of the month preceding the date the first monthly payment is due will be added to my loan balance. The amount of the first monthly payment will be determined without regard to the 7-1/2% change in amount of payment cap set forth in section 3(D) above.

    In the event that my payment mode is changed from biweekly to monthly, interest will be charged thereafter on the basis of a 12 month year and a 30-day month. The interest Rate I will pay will change on the first monthly payment date and on the same day every month thereafter. This revised interest change date will be substituted for the definition of "Interest Change Date" included in Section 2(B) above. The "Payment Change Date" as defined in Section 3(C) above will change to be the date the payment is changed from a biweekly to a monthly payment as described above in this paragraph 7(C) and on that day every 12 months thereafter.

    I understand that if for any reason my payments are changed from biweekly to monthly, the monthly payments will remain in effect for the remaining term of my loan and may not be changed back to biweekly payments unless Lender, at its sole option, agrees in writing to such a change.

    **(D)   Notice of Default**

    If I am in default, the Lender may send me a written notice, called "Notice of Default," telling me that if I do not pay the overdue amount by a certain date, the Lender may require me to pay immediately the amount of Principal which has not been paid and all the interest that I owe on that amount, plus any other amounts due under the Security Instrument.

    **(E)   No Waiver by Lender**

    Even if, at a time when I am in default, the Lender does not require me to pay immediately in full or change my loan type from biweekly to monthly at that time as described above, the Lender will still have the right to do so if I am in default at a later time.

    **(F)   Payment of Lender's Costs and Expenses**

    The Lender will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses may include, for example, reasonable attorneys' fees and court costs.

**8. GIVING OF NOTICES**

    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me or any Borrower at **31 TREEBARK TER, VOORHEES, NJ 08043-3441**, or at a single alternative address if I give the Lender notice of my alternative address. I may give notice to Lender of a change in my address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes.

    Except as permitted above for changes of address, any notice that must be given to the Lender under this Note will be given by mailing it by first class mail to the Lender at 1901 Harrison Street, Oakland, California 94612, or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

    If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who takes over these obligations is also obligated to keep all of the promises made in this Note. The Lender may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

REDACTED

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Lender to demand payment of amounts due. "Notice of Dishonor" means the right to require the Lender to give notice to other persons that amounts due have not been paid.

**11.   SECURED NOTE - ACCELERATION**

In addition to the protections given to the Lender under this Note, the Security Instrument dated the same date as this Note gives the Lender security against which it may proceed if I do not keep the promises which I made in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note and includes the following Paragraph 26:

**AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED**

**Acceleration of Payment of Sums Secured.** Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

**Exception to Acceleration of Payment of Sums Secured.** If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)      Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)     Lender approves the creditworthiness of the transferee in writing;

(iii)    transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)     an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)      the transferee executes an assumption agreement which is satisfactory to Lender, such assumption agreement providing for transferee opening a deposit account with Lender, or with a bank or savings and loan which has been approved by Lender, for direct payment as provided in the Secured Notes.

The loan may be assumed under its then existing terms and conditions with one exception, the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

**12.   GOVERNING LAW; SEVERABILITY**

This Note shall be governed by and construed under federal law and federal rules and regulations including those for federally chartered savings institutions, called "Federal Law." In the event that any of the terms or provisions of this Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Note.

REDACTED

**13. CLERICAL ERRORS**

In the event the Lender at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from the Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold the Lender responsible for any damage to me which may result from any such error

**14. LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Lender delivers to me an indemnification in my favor, signed by the Lender, then I will sign and deliver to the Lender a Loan Document identical in form and content which will have the effect of the original for all purposes

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

REDACTED

**SIGNATURE PAGE**

NOTICE TO BORROWER(S):

BY SIGNING THIS NOTE YOU AGREE TO PAY A PREPAYMENT CHARGE IN CERTAIN CIRCUMSTANCES. PLEASE CAREFULLY READ THIS ENTIRE NOTE (INCLUDING THE PREPAYMENT PROVISION) BEFORE YOU SIGN IT.

**WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED**

(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)
MARK S GURALNICK

# EXHIBIT D

REDACTED

THIS INSTRUMENT PREPARED/DRAFTED BY: WORLD SAVINGS

RECORDING REQUESTED BY:
WORLD SAVINGS BANK

~~WHEN RECORDED MAIL TO:~~
WORLD SAVINGS BANK
FINAL DOCUMENTATION
CLOSING DEPARTMENT
P.O. BOX 659548
SAN ANTONIO, TX 78265-9548

LOAN NUMBER:
51-8021150
NOTE AMOUNT: $277,800.00
PLEASE RETURN TO REC. DEPT.
Lender's First Choice
3820 Royal Avenue
Simi Valley, CA 93063

CAMDEN COUNTY, NJ
~~JAMES BEACH, COUNTY CLERK~~
MTG-OR BOOK 08369 PG 0581
RECORDED 10/26/2006 14:57:11
FILE NUMBER 2006123996
RCPT#: 431999; RECD BY: donna
RECORDING FEES 210.00
MARGINAL NOTATION 0.00

FOR RECORDER'S USE ONLY

## MORTGAGE

THIS IS A FIRST MORTGAGE WHICH SECURES A NOTE WHICH CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE, FREQUENCY AND AMOUNT OF PAYMENTS AND PRINCIPAL BALANCE (INCLUDING FUTURE ADVANCES AND DEFERRED INTEREST). AT LENDER'S OPTION THE SECURED NOTE MAY BE RENEWED OR RENEGOTIATED. THE SECURED NOTE PROVIDES FOR BIWEEKLY PAYMENTS OF PRINCIPAL AND INTEREST.

THE MAXIMUM AGGREGATE PRINCIPAL BALANCE SECURED BY THIS MORTGAGE IS $347,250.00 WHICH IS 125% OF THE ORIGINAL PRINCIPAL NOTE AMOUNT.

I.    DEFINITIONS OF WORDS USED IN THIS MORTGAGE
       (A)    Security Instrument. This Mortgage, which is dated September 21, 2006 will be called the "Security Instrument."

       (B)    Borrower. MARK S GURALNICK, A MARRIED MAN   sometimes will be called "Borrower" and sometimes simply "I" or "me."

51-00574708

       (C)    Lender. WORLD SAVINGS BANK, FSB, ITS SUCCESSORS AND/OR ASSIGNEES, will be called "Lender." Lender is a FEDERAL SAVINGS BANK, which is organized and exists under the laws of the United States. Lender's address is 1901 Harrison Street, Oakland, CA 94612.

       (D)    Note. The note signed by Borrower and having the same date as this Security Instrument, including all extensions, renewals, substitutions and modifications thereof, will be called the "Note." The Note shows that I owe Lender the original principal amount of U.S. $277,800.00 ("Note Amount"), plus accrued and deferred interest and such other amounts as stated in the Note. I have promised to pay the debt in full by October 15, 2036.

       (E)    Property. The property that is described below in Section III entitled "Description of the Property" will be called the "Property."

       (F)    Sums Secured. The amounts described below in Section II entitled "Borrower's Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

       (G)    Person. Any person, organization, governmental authority or other party will be called "Person."

II.    BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY
       I mortgage, irrevocably grant and convey the Property to Lender subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

SD013A (2006-04-3)
DEFERRED INTEREST                    Page 1

U  U  3

LENDER'S USE ONLY

REDACTED

(i)     pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender and any changes to the Secured Notes made with the written consent of Lender;

(ii)    pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

(iii)   keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

## III.     DESCRIPTION OF THE PROPERTY

I give Lender rights in the Property described below:

(i)     The property which is located at **31 TREEBARK TER, VOORHEES, NJ 08043-3441**. The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

(ii)    All buildings and other improvements that are located on the Described Property;

(iii)   All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)    All rents or royalties and other income from the Described Property;

(v)     All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)    All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)   All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)  All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future,

(ix)    All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)     All of the amounts that I pay to Lender under Paragraph 2 below.

## IV.     BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (i) I lawfully own the Property; (ii) I have the right to mortgage, grant and convey the Property to Lender; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## COVENANTS

I promise and I agree with Lender as follows:

## 1.     BORROWER'S PROMISE TO PAY

I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

REDACTED

**2.     PAYMENTS FOR TAXES AND INSURANCE**

**(A)   Borrower's Obligations**

I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

**(B)   Escrow Accounts**

Subject to applicable law, no escrow shall be required except upon written demand by Lender, in which case, I shall pay to Lender on the day payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes, penalties and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums, (d) yearly flood insurance premiums, if any; and (e) yearly mortgage insurance premiums, if any. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for an escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. §2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items in accordance with applicable law

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and/or applicable law permits Lender to make such a charge. However, Lender may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay me any interest or earnings on the Funds. Lender shall give to me, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all Sums Secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to me for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify me in writing, and, in such case I shall pay to Lender the amount necessary to make up the deficiency or shortage. I shall make up the deficiency or shortage in accordance with the requirements of the Lender, at its sole discretion, in the manner and times prescribed by RESPA.

Upon payment in full of all Sums Secured by this Security Instrument, Lender shall promptly refund to me any Funds held by Lender. If, under Paragraph 27, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the Sums Secured by this Security Instrument.

REDACTED

**3.     APPLICATION OF BORROWER'S PAYMENTS**

Unless the law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes:

First, to pay prepayment charges due under the Secured Notes;
Second, to pay any advances due to Lender under this Security Instrument;
Third, to pay the amounts due to Lender under Paragraph 2 above;
Fourth, to pay interest due under the Secured Notes;
Fifth, to pay deferred interest due under the Secured Notes;
Sixth, to pay principal due under the Secured Notes;
Last, to pay late charges due under the Secured Notes.

**4.     BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**

I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a **lien**. I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up, or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5.     BORROWER'S OBLIGATION TO MAINTAIN INSURANCE**

At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a **Standard Mortgagee Clause** to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

REDACTED

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the Proceeds. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any Proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 27 below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

6. **BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS**

I will keep the Property in good repair including, but not limited to, keeping the Property free from debris, mold, termites, dry rot and other damaging pests and infestations. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal health and safety laws, and hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of mold, termites, dry rot, other damaging pests and infestations and hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the Property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

7. **LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY**

If: (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever it deems reasonable or appropriate to protect the Lender's rights in the Property. Lender's actions may, without limitation, include appearing in court, paying reasonable attorneys' fees, purchasing insurance required under Paragraph 5 above (such insurance may cost more and provide less coverage than the insurance I might purchase), and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes which have not been paid. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

8. **LENDER'S RIGHT TO INSPECT THE PROPERTY**

Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

REDACTED

9. **AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY**

I assign to Lender all my rights. (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the Property that is made to avoid condemnation, eminent domain or other governmental taking of the Property. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction. (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

10. **CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS**

    **(A)   Borrower's Obligations**

    Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

    Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

    **(B)   Lender's Rights**

    Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right under Paragraph 27 below to demand that I make immediate payment in full of the amounts that I owe to Lender under the Secured Notes and under this Security Instrument.

11. **OBLIGATIONS OF BORROWER, CO-SIGNORS AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS**

    Except as provided below, if more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

    Any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signor"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signor's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the Sums Secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signor's consent.

    Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

12. **MAXIMUM LOAN CHARGES**

    If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already

# REDACTED

collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.

**13.    LEGISLATION AFFECTING LENDER'S RIGHTS**
If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument

**14.    NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**
Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at 31 TREEBARK TER, VOORHEES, NJ 08043-3441. A notice will be given to me at an alternative address if I give Lender notice of my alternative address. I may give notice to Lender of my alternative address in writing or by calling Lender's customer service telephone number provided on my billing statement. I may designate only one mailing address at a time for notification purposes. Except as permitted above for changes of address, any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section 1.(C) above entitled, "Definitions of Words Used in this Mortgage," unless Lender gives me notice of a different address Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

**15.    GOVERNING LAW; SEVERABILITY**
This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations, including those for federally chartered savings institutions, ("Federal Law") and, to the extent Federal Law does not apply, by the law of the jurisdiction in which the Property is located. In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

**16.    BORROWER'S COPY**
I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

**17.    LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY**
If Lender requires immediate payment in full or if I abandon the Property, then Lender, Persons authorized by Lender, or a receiver appointed by a court at Lender's request may: (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B), enter upon and take possession of the Property, (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 27, I understand and agree that: (A) my right to occupy the Property ceases at the time the Property is sold, (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction  All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

**18.    INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS**
An **assignment** is a transfer of rights to another  I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include an action for breach of contract, fraud, concealment of a material fact or for intentional or negligent acts. I assign these rights, and any proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to any amount that I may owe to Lender under the Note and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment.

REDACTED

**19.    CLERICAL ERRORS**

In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error, printing error or similar error, I agree, upon notice from Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.    LOST, STOLEN OR MUTILATED DOCUMENTS**

If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**21.    WAIVER OF STATUTE OF LIMITATIONS**

I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

**22.    CAPTIONS**

The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.    MODIFICATION**

This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**24.    CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**

If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

(A)    If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

(B)    The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

(C)    If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a **master** or **blanket** policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such master or blanket policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the monthly payment to Lender of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such **master** or **blanket** policy to Lender annually.

REDACTED

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me.

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

(D)   I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the master or blanket hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

25.   FUTURE ADVANCES
At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances, with interest, to Borrower. Such future advances, with interest, will then be additional Sums Secured under this Security Instrument.

26.   AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED

Acceleration of Payment of Sums Secured. Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

Exception to Acceleration of Payment of Sums Secured. If the sale or transfer of all or any part of the Property, or of a beneficial interest in Borrower, if Borrower is not a natural Person, is the first one to occur after the date of this Security Instrument, Lender will not exercise the option to accelerate payment in full of all Sums Secured and the loan may be assumed if:

(i)   Lender receives a completed written application from transferee to evaluate the creditworthiness of transferee as if a new loan were being made to the transferee by Lender;

(ii)   Lender approves the creditworthiness of the transferee in writing;

(iii)   transferee makes a cash downpayment sufficient to meet Lender's then current underwriting standards;

(iv)   an assumption fee, in an amount to be determined by Lender (but not to exceed 1% of the balance of Principal and interest due under the Secured Notes at the time of sale or transfer of the Property or of the interest in the Borrower) is paid to Lender; and

(v)   the transferee executes an assumption agreement which is satisfactory to Lender. Such assumption agreement may provide, if required by Lender, that the transferee open a deposit account with Lender or with a bank or other depository institution approved by Lender, to facilitate direct payments if direct payments are required in the Note.

The loan may be assumed under its then existing terms and conditions with one exception; the Lifetime Rate Cap may be changed. The Lifetime Rate Cap shall be changed to an interest rate which is the sum of the interest rate in effect on the date of a sale or transfer of the Property or beneficial interest in Borrower plus 5 percentage points, if that sum exceeds the Lifetime Rate Cap stated in the Secured Notes.

REDACTED

27.   **RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY**

It will be called a "Breach of Duty" if (i) I do not pay the full amount of each payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading. If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

If there is a Breach of Duty by me, Lender may take action to have the Property sold under any applicable Federal Law, rule or regulation and, where Federal Law is not applicable, under the law of the state where the Property is located, which will be called the "Applicable Law."

Lender does not have to give me notice of a Breach of Duty unless notice is required by Applicable Law. If Lender does not make a demand for full payment upon a Breach of Duty, Lender may make a demand for full payment upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed under the Applicable Law to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property.

The sale of the Property may be postponed by or at the direction of Lender except as limited or prohibited by the Applicable Law. If the Property is sold under the Applicable Law, I agree that it may be sold in one parcel. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property, except to the extent that the Applicable Law limits or prohibits any such charges.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including trustees' and attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

28.   **LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT**

When Lender has been paid all of the amounts secured by this Security Instrument, Lender shall release or cancel this Security Instrument without charge to me except that I will pay any recordation costs.

29.   **STATEMENT OF OBLIGATION**

To the extent allowed by law, I will give Lender a fee for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

30.   **NO CLAIM OF CREDIT FOR TAXES**

I will not make a deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. I will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

31.   **WAIVER OF REDEMPTION**

My right of redemption is waived to the extent allowed by Applicable Law.

32.   **WAIVER OF HOMESTEAD EXEMPTION**

I waive any and all rights and benefits of homestead exemption in the Property.


**THIS SPACE INTENTIONALLY LEFT BLANK.**

REDACTED

**33.   ( x )   QUICK QUALIFYING LOAN PROGRAM**

I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that: (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property (i.e., allow any other legal claims against it) and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) If I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

**34.   ( x )   OWNER OCCUPANCY**

Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that: (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

**( X )   VALUE INDICATES THAT THE PARAGRAPH APPLIES.**

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

REDACTED

**BY SIGNING BELOW,** I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

Signed, sealed and delivered in the presence of.

WITNESS(ES):

_Nancy M. O'Neill_ _____

_____

_Borrower(s) acknowledges receipt of a true copy._

**BORROWER(S):**

_____ (Seal)

MARK S GURALNICK

Mailing Address: 31 TREEBARK TER, VOORHEES, NJ 08043-3441

**ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT**

REDACTED

**BORROWER(S)' SPOUSE(S):** The undersigned hereby joins in this Security Instrument for the sole purpose of encumbering, subordinating, conveying and/or waiving any current or potential interest in the Property. By signing below, the undersigned encumbers, subordinates, conveys and/or waives any and all rights, interests or claims in the Property, including, but not limited to, homestead, dower, marital or joint-occupancy rights. No personal liability under the Note is hereby incurred by the undersigned joining spouse.

**(PLEASE SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)**

Signed, sealed and delivered in the presence of:

WITNESS(ES):

_Nancy M. O'Neill_ _____        _____
                                              Borrower(s) acknowledges receipt of a true copy

                        **BORROWER(S)' SPOUSE(S):**   _AS A WITNESS_
                                                      _AND NOTE AS A CO-PARTY_
                                                      _OR AN ACCOMMODATION MAKER_

_____  (Seal)


_____  (Seal)


_____  (Seal)


Mailing Address: 31 TREEBARK TER, VOORHEES, NJ  08043-3441


**ATTACH INDIVIDUAL NOTARY ACKNOWLEDGEMENT**


SD013 (2004-03-1)                          Page 13                        NJ
          [X02 (2004-03-01)]

## EXHIBIT "A"

TAX MAP REFERENCE. (N.J.S.A. 46:15-1.1) MUNICIPALITY OF VOORHEES TOWNSHIP

BLOCK NO. 206.12 LOT NO. 40

THE PROPERTY CONSISTS OF THE LAND AND ALL THE BUILDINGS AND STRUCTURES ON THE LAND IN THE TOWNSHIP OF VOORHEES COUNTY OF CAMDEN AND STATE OF NEW JERSEY. THE LEGAL DESCRIPTION IS:

BEGINNING AT A POINT IN THE CUL-DE-SAC OF TREEBARK TERRACE (FORMERLY ROLLING HILL COURT) DISTANT A TOTAL ARC AND TANGENT DISTANCE OF 573.54 FEET SOUTHEASTWARDLY FROM THE SOUTHEASTERLY END OF A CURVE HAVING A RADIUS OF 20.00 FEET CONNECTING THE NORTHWESTERLY LINE OF TREEBARK TERRACE (FORMERLY ROLLING HILL COURT) WITH A SOUTHEASTERLY LINE OF COURTLAND DRIVE (50 FEET WIDE), SAID BEGINNING POINT ALSO BEING IN THE DIVISION LINE OF LOTS 40 AND 41, BLOCK 206.12 AS SHOWN ON THE PLAN HEREINAFTER MENTIONED; THENCE

1. NORTH 71 DEGREES 32 MINUTES 18 SECONDS EAST, ALONG THE SAID DIVISION LINE, A DISTANCE OF 192.37 FEET TO A POINT IN THE SOUTHWESTERLY LINE OF COOPER ROAD, ALSO KNOWN AS COUNTY ROUTE 615 (THE SAID SOUTHWESTERLY LINE BEING 37.00 FEET FROM THE CENTER LINE THEREOF;) THENCE

2. SOUTH 26 DEGREES 59 MINUTES 32 SECONDS EAST, ALONG THE SOUTHWESTERLY LINE OF COOPER ROAD, A DISTANCE OF 240.75 FEET TO A POINT IN THE BOUNDARY LINE OF THE SAID PLAN; THENCE

3. NORTH 84 DEGREES 43 MINUTES 17 SECONDS WEST ALONG THE SAID BOUNDARY LINE, A DISTANCE OF 396.57 FEET TO A POINT IN THE DIVISION LINE OF LOTS 39 & 40, SAID BLOCK AND PLAN; THENCE

4. NORTH 25 DEGREES 13 MINUTES 43 SECONDS EAST ALONG THE SAID DIVISION LINE, A DISTANCE OF 48.47 FEET TO A POINT IN THE CUL-DE-SAC OF TREEBARK TERRACE (FORMERLY ROLLING HILL COURT); THENCE

5. SOUTHEASTERLY, EASTWARDLY, NORTHEASTERLY, NORTHWARDLY AND NORTHWESTWARDLY, ALONG THE CUL-DE-SAC OF TREEBARK TERRACE (FORMERLY ROLLING HILL COURT), CURVING TO THE LEFT AND HAVING A RADIUS OF 60.00 FEET, AN ARC DISTANCE OF 140.0 FEET TO THE POINT AND PLACE OF BEGINNING.

BEING KNOWN AS LOT 40 IN BLOCK 206.12 AS SHOWN ON A SUBDIVISION PLAN ENTITLED "ALLUVIUM SECTION 32" AS FILED IN THE OFFICE OF THE

**EXHIBIT "A"**

REGISTER OF DEEDS & MORTGAGES OF CAMDEN COUNTY ON MAY 11, 1988 AS
MAP #743-4.

ALSO BEING KNOWN AS LOT 40, BLOCK 206.12 ON THE VOORHEES TAX MAP.

FOR INFORMATIONAL PURPOSES ONLY: THE APN IS SHOWN BY THE COUNTY
ASSESSOR AS 206.02-6; SOURCE OF TITLE IS BOOK 4816, PAGE 0652
(RECORDED 05/07/96)

**Prepped**

NOV 2 7 2006

Vionna L'Homme

**Acknowledgment-Individual**

STATE OF NEW JERSEY, COUNTY OF CAMDEN SS.:

I CERTIFY that on *SEPTEMBER, 22,* 20*06* , Mark S Guralnick

personally came before me and stated to my satisfaction that this person (or if more than one, each person):

(a) was the maker of the attached instrument; and,

(b) executed this instrument as his or her own act.

*Nancy M. O'Neill*

NANCY M. O'NEILL    NOTARY

(Print name and title below signature)

**Nancy M. O'Neill**
**Commission Expiration**
**Date: April 2010**

Prepped

NOV 27 2006

Vionna L'Homme

**Acknowledgment-Individual**

STATE OF NEW JERSEY, COUNTY OF CAMDEN SS.:

I CERTIFY that on _SEPTEMBER 22,_ 20_06_ , Mark S Guralnick

personally came before me and stated to my satisfaction that this person (or if more than one, each person):

(a) was the maker of the attached instrument; and,

(b) executed this instrument as his or her own act.

_Nancy M. O'Neill_

NANCY M. O'NEILL NOTARY
(Print name and title below signature)

Nancy M. O'Neill
**Commission Expiration**
**Date: April 2010**

Prepped

NOV 2 7 2006

Vionna L'Homme

**Acknowledgment-Individual**

STATE OF NEW JERSEY, COUNTY OF CAMDEN SS.:

I CERTIFY that on _SEPTEMBER 22, 2006_ , _SUZANNE GURALNICK_ (non-borrowing spouse)

personally came before me and stated to my satisfaction that this person (or if more than one, each person):

(a) was the maker of the attached instrument; and,

(b) executed this instrument as his or her own act.

_Nancy M. O'Neill_
NANCY M. ONEILL   NOTARY
(Print name and title below signature)

**Nancy M. O'Neill**
**Commission Expiration**
**Date: April 2010**

Prepped

NOV 27 2006
Vionna L'Homme

New Jersey Acknowledgement  Rev 2004mar29  Page 1 of 1

**Acknowledgment-Individual**

STATE OF NEW JERSEY, COUNTY OF CAMDEN SS.:

I CERTIFY that on , *SEPTEMBER 22*, 20*06*, *SUZANNE GURALNICK* _____(non-borrowing spouse)

personally came before me and stated to my satisfaction that this person (or if more than one, each person):

(a) was the maker of the attached instrument; and,

(b) executed this instrument as his or her own act.

Nancy M. O'Neill
Commission Expiration
Date: April 2010

*Nancy M. O'Neill*
NANCY M. O'NEILL   NOTARY
(Print name and title below signature)

Prepped

NOV 27 2006

Vionna L'Homme

# EXHIBIT E



**Office of Thrift Supervision**
Department of the Treasury

Nicholas J. Dyer
*Assistant Regional Director*

Pacific Plaza, 2001 Junipero Serra Boulevard, Suite 650, Daly City, CA 94014–1976
P.O. Box 7165, San Francisco, CA 94120-7165 • Telephone: (650) 746-7025 • Fax: (650) 746-7001

November 19, 2007

John A. Stoker, Esq.
Vice President and Assistant General Counsel
Wachovia Corporation
Legal Division — NC0630
One Wachovia Center
301 South Charlotte Street
Charlotte, NC 28288

Re:  World Savings Bank, FSB, Oakland, California
     Notice of Amendment of Charter and Bylaws

Dear Mr. Stoker:

This is in response to your letter, dated November 8, 2007, with enclosures, which you filed with the Office of Thrift Supervision (OTS) on behalf of World Savings Bank, FSB to amend the savings bank's charter and bylaws to change its name to Wachovia Mortgage, FSB and reflect a change in the location of its home office. The new home office address is 6825 Aliante Parkway, North Las Vegas, Nevada.

The institution met the requirements of 12 C.F.R. §§ 552.4(b) and 552.5(b)(2), and the proposed amendments will be effective December 31, 2007, as set forth in the Board of Directors' resolution adopting the changes to the charter and bylaws. The filing also met the requirement of 12 C.F.R. § 545.91(b) that the savings bank notify the OTS if there is a change in the permanent address of its home office.

Please feel free to contact me at (650) 746-7025 if there are any questions.

Sincerely,

Nicholas J. Dyer
Assistant Regional Director

cc:  Robert Burns, FDIC – Atlanta



Comptroller of the Currency
Administrator of National Banks

Large Bank Licensing

November 1, 2009

Mr. James E. Hanson
Vice President
Wells Fargo Bank, National Association
90 South Seventh Street
Minneapolis, MN 55479

Re:  Application to convert Wachovia Mortgage, FSB, North Las Vegas, Nevada to a national
     bank and application to merge the converted bank with and into Wells Fargo Bank,
     National Association, Sioux Falls, South Dakota
     Application Control Numbers:  2009-ML-01-0007 and 2009-ML-02-0010

Dear Mr. Hanson:

This letter is the official certification of the Comptroller of the Currency (OCC) of the
conversion of Wachovia Mortgage FSB, North Las Vegas, Nevada to a national bank with the
name Wells Fargo Bank Southwest, National Association, effective November 1, 2009. This is
also the official certification to merge Wells Fargo Bank Southwest, National Association with
and into Wells Fargo Bank, National Association, Sioux Falls, South Dakota, effective
November 1, 2009.

If you have questions regarding this letter, please contact me at (202) 874-5294 or by email at:
Stephen.Lybarger@occ.treas.gov . Please reference the application control number or numbers
in any correspondence.

Sincerely,

Stephen A. Lybarger
Large Bank Licensing Lead Expert

# EXHIBIT F

**REED SMITH LLP**
*Formed in the State of Delaware*
Mark S. Melodia, Esq.
Diane A. Bettino, Esq.
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08540
Tel. (609) 987-0050  Fax. (609) 951-0824
Attorneys for Defendants

|  |  |
|---|---|
| MARK S. GURALNICK and SUZANNE GURALNICK, individually and as a class representative on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & CO.,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY CAMDEN COUNTY/LAW DIVISION<br><br>DOCKET NO. L-811-13<br><br>Civil Action<br><br>**NOTICE OF FILING OF NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT** |

To:   Clerk, Law Division
Superior Court of New Jersey
501 South Fifth Street
Camden, NJ 08103

Mark S. Guralnick, Esq.
800 Cooper Road, Suite 3
Voorhees, NJ  08043
*Attorneys for Plaintiff*

**PLEASE TAKE NOTICE** that on April 4, 2013, Defendant Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"), by and through their counsel, Reed Smith LLP, filed the attached Notice of Removal, a true and correct copy of which is annexed hereto as "Exhibit A", with the United States District Court for the District of New Jersey, thereby removing this action from the Superior Court of New Jersey, Law Division, Camden County to the Federal District Court.

Pursuant to 28 U.S.C. § 1446(d), the Superior Court of New Jersey shall proceed no further unless and until this action is remanded.

Respectfully submitted,

**REED SMITH LLP**

By: _____
Mark S. Melodia, Esq.
Diane A. Bettino, Esq.
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08543
*Attorneys for Defendant*

Dated: April 4, 2013